Filed 11/24/20  P. v. Ramirez CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>JOSE LUIS RAMIREZ,<br><br>    Defendant and Appellant. | B301432<br><br>(Los Angeles County<br>Super. Ct. No. TA145931) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Patrick Connolly, Judge.  Affirmed.

Janet Gusdorff, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Nancy Lil Ladner, Deputy Attorneys General, for Plaintiff and Respondent.

_____

A jury convicted Jose Luis Ramirez (appellant) of murder (Pen. Code, § 187, subd. (a); count 1),[1] arson of an inhabited dwelling (§ 451, subd. (b); count 2), and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3).  As to count 1, the jury found that appellant committed murder in the first degree, and that he personally and intentionally discharged a handgun, causing great bodily injury, within the meaning of section 12022.53, subdivision (d).  As to count 2, the jury found that appellant used an accelerant, an aggravating factor under section 451.1, subdivision (a)(5).  The trial court sentenced appellant to serve 63 years to life in state prison.

On appeal, appellant contends that the trial court erred when it denied his request to instruct the jury on voluntary manslaughter based on a heat-of-passion theory.  We find no error and affirm.

## FACTS

### Prosecution Case

#### Background

After he was released from jail, appellant moved in with his father Jose Ramirez Ramos (Ramos), his mother Clementina Ramirez (Clementina), and two of his sisters, Giselle R. (Giselle) and Yesenia R. (Yesenia).  At various times, appellant threatened his family members.

Ramos testified that appellant used drugs, but Ramos did not know what kind.  He wanted appellant to move out and unsuccessfully tried to get the police to take him to a

---

[1]     All further statutory references are to the Penal Code unless otherwise indicated.

2

rehabilitation center.  At one point, he forced appellant out but Clementina let him back in.

Sometimes appellant would say things that made him sound crazy.  He accused Clementina of stealing his money and filed a police report.  He also accused an adult sister, Lizette, of stealing money from him.  Appellant and Clementina argued often, usually about money.  She repeatedly told him that he needed to get help.

The Events of April 23, 2018

On April 23, 2018, appellant placed taped-over beer bottles containing paint thinner behind a Christmas tree in the living room.  Clementina and Giselle brought the bottles to Ramos, who put them outside.  Appellant asked Ramos for the bottles, saying he needed them for his body shop work.  Clementina did not believe the explanation and was upset.  She wanted the paint thinner removed.  In a calm manner, Clementina told appellant he needed help.  He said, "I want my stuff.  You're f***king crazy."  He was furious.  She said she was going to get him help, that everything would be okay, and that she loved him.  Giselle testified that appellant and Clementina argued for about 15 to 20 minutes, and they were yelling.  Ramos testified that Clementina was calm, and that there was no argument.  But he also testified that "[t]hey argued, but not seriously."

Appellant went outside and paced for about an hour.  Ramos said he would take appellant to Mexico because his grandmother had died.  That night, Ramos and Clementina went to bed after 10:00 p.m.  Appellant was in his room at the time.

<u>The Fire and the Shooting</u>

At about 4:00 a.m., appellant woke up his family and said the house was on fire. Smoke was coming out of appellant's bedroom. Ramos began dousing the fire with water.

Appellant and Giselle separately called 911 at 4:30 a.m. from the front yard. Giselle accused him of causing the fire, and he denied culpability. Clementina was mad but did not yell. Firefighters arrived around 4:36 a.m.

Ramos testified that he stood with Clementina and watched the firefighters. He then saw appellant and Clementina arguing. She asked what happened in his room, and why his room was burning. When she asked if he did it intentionally, he said no. At some point, she asked a fireman to arrest appellant. Per Ramos, he walked away on the sidewalk and told appellant to stop arguing. Ramos tripped on a hose and then heard shots. He looked back and saw Clementina on the ground.

Giselle testified that she was across the street with her pets when the firefighters arrived. Clementina came across the street and told Giselle that everything would be okay. Then Clementina crossed back over the street. Giselle heard three to six booming noises.

Captain Lorenzo Armstead testified that when he arrived, the family was on the front lawn, and Clementina was frantic and upset. She yelled at Captain Armstead to arrest appellant. Captain Armstead told Clementina to calm down. He asked where the fire was, and she said that it was in the back of the house. Along with other firefighters, he went to the back bedroom and quickly put out the fire—which was in and near the closet—at 4:42 a.m. Near the closet, he saw what appeared to be a flammable liquid can on the floor. It smelled like acetone or

4

some type of lacquer. They opened the windows, poked a hole in the ceiling to check for flames in the attic, and did a secondary check in the house for other people. They exited the house and went to the fire engine to change their coats.[2]

At that point, Captain Armstead went back toward the house and saw appellant in the front doorway. They passed each other on the walkway as appellant was leaving the house. Captain Armstead walked two steps into the front room and heard gunfire.

Firefighter Ryan Umali testified that after the fire had been put out, he prepared for the process of cleaning up the house, taking out all the burned contents, etc. Inside a fire engine, he changed his jacket. He saw a man walk up to a woman and shoot her in the head. She fell to the ground, and he shot her again.

<u>The Arson Investigation</u>

The same morning as the fire, an arson investigator for the City of Los Angeles named Gus Gaeta was called to the scene at 8:54 a.m. He determined that the fire in appellant's bedroom was intentionally set with an ignitable fluid such as paint thinner.

**Defense Case**

Appellant did not present evidence.

**The Trial Court's Refusal to Give CALCRIM No. 570**

Defense counsel asked the trial court to instruct on CALCRIM No. 570, the standard instruction for voluntary manslaughter: heat of passion.

---

[2] Captain Armstead said they changed from turnout coats to brush jackets.

5

The trial court concluded that the instruction should not be given because there was insufficient evidence of provocation.

**DISCUSSION**

## I. Relevant Law; Standard of Review.

A trial court has a duty to instruct on a lesser included offense if there is substantial evidence that a defendant committed it and not a greater crime. But it must not instruct on a lesser included offense "when the evidence, even construed most favorably to the defendant, would not support a finding of guilt of the lesser included offense but would support a finding of guilt of the offense charged. [Citation.]" (*People v. Stewart* (2000) 77 Cal.App.4th 785, 796.)

Voluntary manslaughter is a lesser included offense of murder. (*People v. Breverman* (1998) 19 Cal.4th 142, 154 (*Breverman*).) It is defined in section 192, subdivision (a) as the unlawful killing of a human being without malice due to, inter alia, heat of passion, i.e., the killer's reason was obscured due to a strong passion aroused by a provocation sufficient to cause an ordinary person of average disposition to act rashly or without due deliberation and reflection based on that passion rather than judgment. The passion aroused need not be anger or rage, but can be any violent, intense, high-wrought or enthusiastic emotion other than revenge. (*Breverman*, *supra*, 19 Cal.4th at p. 163.)

"Predictable and reasonable conduct by a victim . . . is not sufficient provocation . . . [for] voluntary manslaughter." (*People v. Enraca* (2012) 53 Cal.4th 735, 760.)

If there is no evidence that the killer exhibited anger, fear, or rage, then there is insufficient evidence to establish that the killer acted while under the heat of passion. (*People v. Manriquez* (2005) 37 Cal.4th 547, 585.)

6

## II. Analysis.

Appellant contends that when the evidence is viewed in a light most favorable to him (*People v. Wright* (2015) 242 Cal.App.4th 1461, 1483), it is sufficient to show that he acted in a heat of passion because he was provoked when Clementina tried to get him arrested. He claims that the trial court erred when it did not instruct the jury with CALCRIM No. 570 (the standard voluntary manslaughter: heat of passion instruction) and CALCRIM No. 522 (the standard instruction establishing that provocation can impact the degree of murder or reduce murder to manslaughter).[3] We disagree.

First, there was no evidence that appellant exhibited anger or any other passion due to Clementina's statements. At most, there is testimony that he argued with Clementina. The record does not paint a picture of his demeanor.

Second, even if we infer that he was operating under a high wrought emotion when Clementina accused him of setting the fire and tried to get him arrested, her behavior was not a provocation because it was predictable and reasonable. They often argued and the facts—his recent possession of paint thinner in beer bottles, his warning of the fire, and the smoke emanating from his bedroom—suggested that he caused of fire. Thus, it was foreseeable she would accuse him of starting the fire and ask that he be arrested.

---

[3]     The People argue that appellant forfeited his argument as to CALCRIM No. 522 because he did not request it below. We need not reach this argument because we conclude there was insufficient evidence of provocation and no heat of passion instructions were required.

Third, case law explains that a "'"provocation of slight and trifling character, such as words of reproach, however grievous they may be, or gestures, or an assault, or even a blow, is not recognized as sufficient to arouse, in a reasonable [person], such passion as reduces an unlawful killing with a deadly weapon to manslaughter."'" (*People v. Najera* (2006) 138 Cal.App.4th 212, 226.) We similarly conclude that a request that law enforcement arrest an apparent criminal is not sufficient to arouse such passion in a reasonable person. Though appellant calls Clementina's behavior an intense betrayal on par with weeks of taunting and sexual manipulation by an unfaithful wife (*People v. Berry* (1976) 18 Cal.3d 509, 515) or a long series of provocative acts and taunts by an unfaithful lover (*People v. Borchers* (1958) 50 Cal.2d 321, 328–329), we cannot accept this characterization. While the behavior exhibited in those cases is cruel and not tolerated in a civilized society, seeking redress from law enforcement by people who perceive themselves to be victims of crime is generally encouraged. As a matter of policy, we decline to equate these behaviors.

## DISPOSITION

The judgment is affirmed.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.

_____, J.

          ASHMANN-GERST

We concur:

_____, P. J.

      LUI

_____, J.

      CHAVEZ